UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| ROGER J. BONICH, JR, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 12-3227-CV-S-ODS-P |
| ) | |
| LARRY DENNEY, ) | |
| ) | |
| Respondent. ) | |

**OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS AND
DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY**

Petitioner, Roger J. Bonich, Jr., filed this pro se habeas corpus petition pursuant to 28 U.S.C. §  2254 on April 18, 2012, seeking to challenge his 2007 convictions and sentences for two counts of attempted statutory sodomy in the first degree and one count of statutory sodomy in the first degree, which were entered in the Circuit Court of Greene County, Missouri. In his 135 page petition, petitioner raises 65 grounds for relief, all of which respondent contends are procedurally defaulted.

**SUMMARY OF THE FACTS**

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> On May 8-9, 2004, [eight-year-old] K.B.'s thirteen-year-old friend, S.M., who was also a neighbor, spent the weekend with K.B. at the home she shared with [petitioner]. The girls slept in [petitioner's] bedroom. K.B. was sleeping in bed with [petitioner] and S.M. was sleeping on some blankets on the floor. When S.M. went to sleep she was wearing a t-shirt [petitioner] had provided her and a pair of jeans she had borrowed from her mother.
>
> At some point in the night S.M. awoke to find that her pants were off and [petitioner] was lying on the floor next to her clad only in boxer shorts. [Petitioner's] hand was on her vagina on the outside of her underwear. As S.M. awakened he withdrew his hand from her body and rolled away from her. S.M., who was scared, got up from the floor and went into K.B.'s bedroom, which was connected to [petitioner's] bedroom. Once she was in the bedroom, S.M. "found some clothes and put them on." She encountered [petitioner], who was on his way to the bathroom, and she told him she was going to sleep in the bedroom for the remainder of the evening. S.M. testified she wanted to [sic] "[j]ust to get out of

there..." and had no intention of staying in the house. S.M. then "went downstairs and left."

S.M. walked home and knocked on her mother's window to wake her up. When S.M.'s mother, C.K., came to the door to let S.M. into the house, S.M. told her that she woke up and her pants were off. She testified at trial that she was at that time scared to tell her mother what had happened to her. While the two were standing by the front door talking, C.K. saw [petitioner] drive by their home in his vehicle. C.K., who did not have a telephone in the home, then took her husband and S.M. to a nearby convenience store to telephone the authorities and C.K. went to [petitioner's] house to confront him. n.3. C.K. approached [petitioner's] home and began yelling at him through the front door. Police officers soon arrived on the scene. At some point during the altercation, [petitioner] told C.K. he had removed S.M.'s jeans because "her pants looked tight. [He] was trying to make her comfortable."

> n.3 When interviewed at the convenience store by the police, S.M. stated that she was staying overnight with K.B.; that she "fell asleep around 10 o'clock p.m.;" that she "was awoken or awakened... to have her pants off, and with [petitioner] in between her and her friend." At trial, S.M. admitted she told the officer "the truth, but [she] didn't tell him everything."

In his initial discussions with the police that evening, [petitioner] told the officers that he had been sleeping in his room and the girls had been sleeping in K.B.'s room. While at the house interviewing [petitioner], the officers recovered the clothing S.M. said she left behind in K.B.'s room when she changed clothes. n.4.

> n.4 Authorities tested the jeans S.M. was wearing when she went to bed and the jeans she wore home from K.B.'s house. The jeans she wore home from K.B.'s house had a seminal stain on them and the semen was determined to be mainly [petitioner's].

S.M. was taken to the hospital that evening for an examination. While at the hospital, she reported to an officer that she woke up at her friend's house and "her pants had been removed and that the father of her friend she was spending the night with... was in bed with her." C.K. thereafter placed a hotline call to the Children's Division of the Department of Social Services ("the Children's Division") in relation to S.M.'s allegations. n.5 and K.B. was ultimately removed from the home based on this hotline call.

> n.5 In relation to the hotline call, S.M. told Esther Strickland ("Ms. Strickland"), an intake worker with the Children's Division, that

–2–

> [s]he had gone to spend the night at one of her friends' house, and that in the middle of the night she had gotten up and run home because she had discovered that she didn't have any pants on, and when she had gone to bed, she did have pants on. When she woke up she got scared, she ran home and told her mother what happened....

In early May of 2004, [petitioner] met with police officers and juvenile authorities on several occasions. Kevin Hazelrigg ("Mr. Hazelrigg"), a Greene County deputy juvenile officer, testified that "[o]riginally, [petitioner's] story was that [S.M.] and his daughter [K.B.]...were sleeping in...[K.B.'s] bedroom." However, during the interview, [petitioner] changed his story and admitted the girls had been sleeping in his bedroom. [Petitioner] then admitted he did remove S.M.'s pants, but he stated he did so "because she was sleeping and looked uncomfortable." Further, Mr. Hazelrigg testified that in an earlier meeting [petitioner] told him that on the evening in question he "was not aware that [S.M.] had ever left the home until he woke up [at] approximately 1:30 in the morning and [C.K. was] honking in his driveway... and they got into a confrontation in the front lawn." [Petitioner] then changed his story and told Mr. Hazelrigg that

> in the middle of the night – 1 o'clock, 1:30 in the morning – he heard a door shut. It woke him up, it startled him, he got up, looked – [K.B.] was next to him in his bed, [S.M.] was no longer on the floor where she had been sleeping in front of the television. He searched the house quickly; she was gone. He went out the front door, saw her – a figure running down the street. He got in his car, and he followed her to make sure she got home safely.

At trial, S.M. testified that she told the entire story of what happened to her for the first time to the people at the Child Advocacy Center when she was interviewed there on May 13, 2004. She stated that up until that point she had not been able to bring herself to tell anyone, including C.K., that [petitioner] had touched her. n.6.

> n.6 In her deposition testimony taken prior to trial, S.M. stated that when she woke up [petitioner] was "rubbing" her vagina on the outside of her underwear and "[w]hen [she] woke up he moved and turned around like he was asleep."

[Petitioner] did not testify in this matter or present any evidence in his

–3–

>       defense. At the close of all the evidence, the jury convicted [petitioner] of the crimes charged and he was thereafter sentenced by the trial court....

(Respondent's Exhibit H, pp. 3-6).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## PROCEDURAL DEFAULT - GROUNDS 1-65

In Grounds 1-65, petitioner alleges numerous grounds for relief. Petitioner's grounds can be grouped into several categories: evidence at trial, ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and miscellaneous complaints about the judge, the trial, and the state post-conviction process. Petitioner also complains that he was assaulted while in custody and denied medical treatment.[2] Respondent contends that Grounds 1-65 are procedurally defaulted.

In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court held:

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

[2] To the extent that petitioner feels that his civil rights have been violated, he should bring those claims in a separate suit under 42 U.S.C. § 1983, which will be subject to a separate filing fee of $350.00. Any motions petitioner may file in this case regarding those potential claims will be denied as improperly brought in this Section 2254 habeas corpus matter.

–4–

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Id. at 750. Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in Wainwright v. Sykes, 433 U.S. 72 (1977), and Murray v. Carrier, 477 U.S. 478 (1986). Coleman, 501 U.S. at 748-50.

A review of the record shows that none of the 65 grounds at issue in this petition were raised either on direct appeal or in petitioner's appeal from the denial of his Rule 29.15 post-conviction motion. Although petitioner did raise a total of three grounds in his state court appeals, he does not raise those properly exhausted grounds here. Instead, petitioner attempts to raise 65 other grounds, all of which are procedurally defaulted.

Because petitioner's grounds are procedurally defaulted, they may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. The Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

Petitioner does not present any explanation for why any of his grounds were not pursued either on direct appeal or on appeal from the denial of his Rule 29.15 motion and, therefore, has failed to demonstrate cause for his procedural default.[3] As a result, we do not consider prejudice. The Court, however, can still reach the merits of his claims if petitioner can show that he is "probably actually innocent" of the crimes for which he was convicted. Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996), cert. denied, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a

---

[3]Because petitioner does not allege ineffective assistance of post-conviction counsel as cause for his procedural default, Martinez v. Ryan, 132 S.Ct. 1309 (2012) does not apply.

–5–

two-part test: First, he must support his allegations of constitutional error "with <u>new</u> reliable evidence. . . that was not presented at trial." Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." <u>Id.</u>, <u>citing</u> <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). Petitioner fails to make this showing.

Petitioner has failed to show cause for his default of his 65 grounds. He does not show that a manifest injustice will occur if these grounds are not reviewed on the merits, and he has failed to meet the <u>Schlup</u> standard for actual innocence. <u>Id.</u> Therefore, federal review of grounds 1-65 is barred.

Grounds 1-65 are denied.

## **CERTIFICATE OF APPEALABILITY**

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." <u>Tennard v. Dretke</u>, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. <u>See</u> 28 U.S.C. § 2254, Rule 11(a).

## **ORDER**

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for a writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

/s/ Ortrie D. Smith
ORTRIE D. SMITH
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: <u>November 9, 2012.</u>